BOROUGHS, ADMRX. *v.* OLIVER, et al.

No. 39886          February 6, 1956          85 So. 2d 191

*Fred Witty,* Greenwood; *John E. Aldridge,* Winona, for appellant.

*Lipscomb, Ray & Barksdale,* Jackson; *Robertson Horton,* Winona, for appellees.

ROBERDS, P. J.

This action was brought by the administratrix of the estate of William Armistead Boroughs to recover damages for his death caused, as it is charged, by the negligence of James Earl Oliver in the driving of a motor truck. The suit is for the benefit of Mrs. Lois H. King, the natural mother, next of kin and only heir at law of decedent. The right of the adoptive parents to recover in this case was denied in 217 Miss. 280, 64 So. 2d 338. The defendants in this action—James Earl Oliver and his mother and father—deny that James Earl Oliver was negligent and say that the death of William Armistead Boroughs was caused solely by his own gross negligence. The jury returned a verdict for plaintiff in the sum of $350.00. From that verdict, and judgment en-

tered in accordance therewith, the plaintiff appeals. There is no cross appeal by defendants. The lower court instructed the jury it could not award punitive damages. Appellant, the administratrix, urges on this appeal that the amount of the verdict is so small as not to bear any reasonable relationship to the extent of the damage and that the case should be remanded for assessment of the damages by another jury, and that the lower court erred in refusing to allow the jury to determine the question of punitive damages.

■■ ■ We now consider the question of damages. The elements which the jury may consider appear to be (1) medical, ambulance, doctor and hospital expense paid, or incurred, by plaintiff; (2) loss of companionship; (3) the present net cash value of the life of deceased at the time of his death—"such damages as the jury may determine to be just, taking into consideration all the damage of every kind to the decedent and all damages of any and all kinds to any and all parties interested in the suit". Section 1453, Mississippi Code of 1942; Bush, et al v. Watkins, et al,     Miss.   , 80 So. 2d 19. In the Bush case the writer expressed his conviction that the life expectancy benefits, after majority of decedent, should be limited to those gratuities the plaintiff had reason to expect to receive had decedent lived and in no case to extend beyond the life expectancy of the plaintiff, but the other judges did not agree to such limitations.

The question of damage is grounded on these circumstances: About six-thirty o'clock in the evening of December 11, 1950, James Earl Oliver, then sixteen and a half years of age, started from the home of his parents and himself in the City of Winona, Mississippi, to go to the public school building in that city to witness practise for a theatrical play to be given at the school. He drove his father's one-half ton pickup truck. This truck had a cab, behind which was an open body with sides

apparently something like a foot high. James drove by the home where Miss Giula Chesteen resided. She got into the truck, and sat to the right on the same seat with James. As they drove north on the east side of Fairground Street, going to the school building, they saw Joe Carson and William Armistead Boroughs walking north on the west side of that street, also going to see the school play rehearsed. These four young people were all students at the school and all good friends. James stopped his truck and called out to Joe and Armistead to come and ride. Joe and Armistead got into the back of the truck. The truck started up. Armistead, standing in the back, placed his hands upon or around the top of the cab. Joe, standing to the rear of Armistead, placed his hands upon Armistead's hips. Armistead then began to rock the truck to the right and to the left, Joe at the same time aiding in that action by pushing Armistead to the right and left in unison with Armistead's motions. This process seems to have continued for a distance of some 889 feet. James knew the truck was being rocked. In fact, he testified that he rolled down his window and asked Joe and Armistead to cease this action. Joe denied that and Miss Chesteen said she did not hear James say that. James cut his truck to the right to park at the east curb of Fairground Street. When he did that Joe and Armistead were thrown to the left out of the back of the truck. The street was paved. Joe was injured but managed to crawl to the west side of the street. James knew the two boys had been thrown from the truck and he stopped within a distance of some thirty feet and rushed back to Armistead. Armistead was on his back on the concrete, about the center of the street, was bleeding profusely and giving forth gurgling sounds. James flagged a Mr. Kinchloe, passing in an automobile, and they placed Armistead in Mr. Kinchloe's automobile and quickly carried him to Howard's Clinic in Winona. Armistead

was groaning and displaying evidence of great pain. It was shortly seen he could not get proper treatment at the Clinic and he was rushed in an ambulance to a hospital in Grenada. On this trip he was conscious and unconscious at intervals. He begged those present not to let him die. He reached the Grenada Hospital about 8 o'clock. Dr. J. K. Avent, who treated him, testified that there were gashes and cuts on his face, but that the fatal blow was a fracture at the base of the skull. He said Armistead was conscious at intervals, and that he suffered great pain and agony. Shots were administered in an effort to ease his pain. In his conscious moments he said he could not live and he begged those present not to let him die. This condition continued through the night and next day. He died about seven o'clock the next evening—December 12, 1950.

As stated, Armistead was sixteen and a half years of age at the time of this tragedy. He weighed about 185 pounds and was in splendid health. He took an active part in various school activities and played on the football team. His adoptive mother testified that he had no bad habits. His life expectancy was 50.10 years.

Hospital, medical, funeral, doctor and burial expenses aggregated the sum of $655.75, but this seems to have been paid by, or charged to, Mrs. Minnie Boroughs, the adoptive mother. It does not appear that Mrs. Lois H. King, the natural mother for whom this action was brought, paid, or became responsible, for any of said amount.

Defendants say the injury was caused entirely and alone by the negligence of decedent and his companion Joe Carson. Plaintiff says that, at most, the actions of decedent and Joe Carson were only a contributing cause. It will be helpful to further detail the testimony on the questions of contributory negligence by decedent and upon the negligence of James Oliver.

It is admitted that Armistead and Joe Carson rocked the cab of the truck to the right and left as indicated above herein. James, the driver, said he knew they were doing that. However, Joe Carson testified that they fell out of the truck as the result of the sudden right turn of the truck made by James Oliver, the driver. It is undisputed the truck had traveled 889 feet while being rocked, and the boys were not thrown out until the cut to the right was made. Joe testified" * * all of a sudden I felt myself flying through the air out of the left side of the truck". James testified he rolled down his window and "told them to go easy, take it easy on the tires". Joe denied that and Miss Chesteen said she did not know whether James did that or not.

There is some conflict in the testimony as to whether James cut the car sharply to the right when he undertook to park it. Joe Carson said, "It suddenly cut to the right". Again he said the truck "quickly cut to the right". Miss Chesteen said James "turned to the right. He turned it sharply I suppose". James Oliver said "I turned to the right, it wasn't sharp or anything; I turned it to the right side". He admitted signing a statement in which he said "There was no car approaching when I turned the truck and I was not having any difficulty with the truck. I just turned it to get in the parking lane. I did turn it pretty sharply."

Joe Carson and James Oliver both went to the Clinic to which Armistead was carried right after the accident. James Oliver drove Joe home that night in the same truck. Joe testified that "He (James) told me he thought he should carry me home because he thought it was his fault". James denied that he told Joe that.

As was observed in the Bush v. Watkins case, supra, "Dealing with the amount of verdicts is one of the most troublesome questions with which the courts have to struggle. There is no exact yardstick, or measurement, by which to test the question. Each case must depend

upon its own facts." But this Court has announced certain rules and principles for guidance in determining whether or not the Court will disturb the amount of damage assessed by the jury.

In Chapman v. Powers, 150 Miss. 687, 116 So. 609, the Court said: "But where the award is so excessive on the one hand, or so inadequate on the other, as that it is manifest that the jury were unduly influenced in arriving at their verdict, it is the duty of the court to award a new trial upon that ground alone." Putting it differently, if, to let the verdict of the jury stand, it is manifest to the court that there will be a manifest miscarriage of justice, a new trial should be granted.

In Vaughn v. Bollis, 221 Miss. 589, 73 So. 2d 160, the Court said: "The verdict of the jury will not be disturbed on appeal where a mere preponderance of the evidence is against it, but will be set aside when it is palpably against the weight of the evidence."

In Bush v. Watkins, supra, this Court said: "Of course, the amount of the verdict is usually for the jury. Our test is whether the verdict is so excessive as to be the result of bias, prejudice or passion on the part of the jury."

The general rule is stated in these words in 16 Am. Jur., page 167, Sec. 245, "The general rule authorizing a review and a reversal on the ground of the inadequacy of damages in the verdict applies in the case of verdicts in actions for wrongful death, where actual and compensatory damages are inadequately assessed. This is true where it clearly appears from the uncontradicted evidence that the amount of the verdict bears no reasonable relation to the loss suffered."

It is undisputed that Armistead experienced agonizing pain and suffering for twenty four hours. He was a young man sixteen and a half years of age, strong and healthy, of fine character, with a life expectancy of fifty

years. By the verdict the jury found defendants liable. That has been adjudicated. If there was liability it is extremely difficult to understand how such liability could have been placed at no more than $350.00.

■■ It is urged by appellees that this was a proper case for the jury to consider and find that decedent was guilty of contributory negligence and that the jury evidently so found. We agree that it was a proper case for assessment of contributory negligence. However, that fact does not prevent our review of the action of the jury in that respect. Vaughn v. Bollis, et al., supra. And, if effort is made to apportion the acts to natural results, it is seen that the act which caused decedent to be thrown from the motor vehicle was that of James Oliver in cutting the truck to the right. Joe Carson and Armistead Boroughs had ridden in the back of the truck 889 feet, the while rocking the top of the truck back and forth, yet neither was thrown out of the vehicle until it was cut to the right. There is no dispute on that important fact.

It is argued that the mother, for whose sole benefit this action was brought, suffered no substantial damage by his death. That is shown, it is forceably urged upon us, by the fact that she permitted Armistead to be adopted by Mrs. Minnie Boroughs. Mrs. King, the mother of Armistead, testified that she permitted the adoption when Armistead was eight years of age because her home had burned, she had no money and no employment, and at the time was destitute. There was no testimony contradicting that. It was further shown that the mother and son, since the adoption, have frequently visited each other, have exchanged gifts and that a motherly affection existed between them.

■■ It is evident from what has been said that this is not a case for punitive damages.

■■ After earnest consideration of this case we are of the opinion it should be reversed for ascertainment

by another jury of the damage for which defendants are responsible. Upon a new trial all of the facts should be presented to the jury on the question of negligence of all parties and the jury will have the right to apportion damages under the comparative negligence statute.

Reversed and remanded for trial on issue of damages only.

All justices concur except Kyle and Holmes, JJ., who took no part.